# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6528 | **DATE** | 9/15/2003 |
| **CASE TITLE** | | Jackson vs. Lake County | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for partial summary judgment [28-1] is denied. Defendant's motion for summary judgment [31-1] is denied. Trial date of 11/3/03 will stand. Date of 10/3/03 for submission for all final pretrial materials to chambers will stand.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 1 6 2003 | |
| | Notified counsel by telephone. | | date docketed | 63 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 9/15/2003 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| MD | courtroom deputy's initials | Date/time received in central Clerk's Office | MD mailing deputy initials | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DON A. JACKSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 01 C 6528 |
| | ) Judge Joan H. Lefkow |
| LAKE COUNTY, an Illinois municipal | ) |
| corporation, | ) |
| | ) |
| Defendant. | ) SEP 1 6 2003 |
| | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Don A. Jackson ("Jackson"), filed a three-count complaint against defendant,

Lake County, an Illinois municipal corporation ("Lake County"), alleging violations of the

Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 *et seq.* ("ADA"). In

Count I, Jackson alleges that Lake County violated 42 U.S.C. § 12112(d)(4)(A) by demanding

that he submit to a blanket mental examination. In Count II, Jackson alleges Lake County

violated 42 U.S.C. § 12112(a) by suspending and subsequently terminating him because of its

perception that he was disabled. In Count III, Jackson alleges Lake County violated 42 U.S.C.

§ 12202(a) and (b) by retaliating against him for exercising his rights. Pending before the court

is Jackson's motion for summary judgment on his Count I claim and Lake County's motion for

summary judgment on all of Jackson's claims. For the reasons stated below, both motions are

denied.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS[1]

Jackson was employed by Lake County as a senior utility worker from September 23, 1996 until his termination on June 25, 2001. (Def. L.R. 56.1 ¶ 5.) Jackson's duties as a senior utility worker, as set out in Lake County's position description, included, among other tasks,

---

[1]The facts as set forth herein, taken from the parties' statements of material facts and supporting materials, are undisputed unless otherwise indicated.

(1)    Assist[ing] Principal Utility Worker in repair and maintenance of pumps, motors, and other mechanical equipment. Occasionally, mak[ing] some repairs alone.

(2)    Repair[ing] water mains and appurtenance[s], replacing piping excavating by hand or machine and repairing damaged property by leveling earth and replanting grass, bushes and trees.
                              ***

(3)    Driv[ing] Class "C" trucks and operat[ing] backhoes, construction equipment such as backhoes, uniloaders, and tractors.

(4)    Operat[ing] sewer rodder and clean[ing] manholes; repair[ing] sanitary sewers.

(5)    Serv[ing] as a lead worker when needed.

(Pl. Resp. to Def. L.R. 56.1 ¶ 6; Pl. Ex. 19.)

On or about February 19, 2001, Jackson filed a written complaint with his department. (Def. L.R. 56.1 ¶ 7.) He complained of "hazing and harassment on the job" and threatened to resign "[i]f there is nothing done to resolve the matter." (*Id.*) Thereafter, Martin Galantha ("Galantha"), Superintendent of Lake County's Public Works, set up a meeting for February 21, 2001, to discuss the complaint. (Def. L.R. 56.1 ¶ 8.) In addition to Jackson and Galantha, also present at the meeting were Robert Brummond ("Brummond"), Lake County's Operations Manager, and Mike Grinnell ("Grinnell"), Lake County's Maintenance Supervisor and Jackson's immediate supervisor. (*Id.*) At the meeting Jackson stated that co-workers Don Van Hoogen ("Van Hoogen"), Ron Sparks ("Sparks") and Peter Falotico ("Falotico"), verbally hazed him, embarrassed him, screamed profanities at him and went out of their way to humiliate him. (Pl. Resp. to Def. L.R. 56.1 ¶ 9.) Jackson also complained that he was being "micro-managed" while on the job. (Def. L.R. 56.1 ¶ 9.)

With respect to being micro-managed while working, Jackson specifically pointed to a recent incident in which Van Hoogan had stood over him as he worked in a trench and criticized

3

his work. (Def. L.R. 56.1 ¶ 11.) Jackson stated that this particular incident caused him to make his complaint of hazing and harassment. (Def. L.R. 56.1 ¶ 12.) When Grinnell heard Jackson relate the details of this incident, however, he believed that Jackson was referring to an incident that occurred the night before in which Grinnell, not Van Hoogan, was the person who stood over Jackson as he worked in a trench. (Def. L.R. 56.1 ¶ 13.)

Grinnell's recollection was that rather than hazing or harassing Jackson, he merely instructed him on how to properly do his assigned job of flaring copper. (Def. L.R. 56.1 ¶ 14.) Grinnell stated that he had become irritated with Jackson because he was not doing the work properly even through Grinnell had instructed him the night before on how to do the assigned work. (Def. L.R. 56.1 ¶ 15.) Grinnell believed it was strange that Jackson would be confused about an incident that happened the night before and that Jackson would confuse a co-worker, Van Hoogan, with his supervisor. (Def. L.R. 56.1 ¶ 16.) Despite Grinnell's belief that Jackson had, in fact, confused him with Van Hoogen, neither Galantha, Grinnell nor Brummond ever asked Van Hoogen if he had any words or problems with Jackson on the day of the trench incident.[2] (Def. L.R. 56.1 ¶ 42.) The February 21 meeting ended with Galantha telling Jackson that the matters discussed would be looked into and investigated. (Galantha dep. at 41.)

Factual disputes make it unclear as to what happened next. The parties agree that Galantha decided on March 1, 2001, to send Jackson for a psychological examination scheduled for March 29, 2001. (Pl. L.R. 56.1 ¶ 71.) Moreover, the parties agree that the examination was

---

[2] The parties dispute whether Van Hoogen could have made such statements to Jackson while Grinnell was not around. Jackson maintains that Van Hoogen made the statements to him prior to Grinnell's arrival at the job site. (Pl. L.R. 56.1 ¶ 39.) Lake County relies on Grinnell's testimony that on the night of the "trench incident" he stood directly above the hole where Jackson was working for the entire shift and that he was the only one that was yelling at Jackson that night. (Def. L.R. 56.1 Add. Facts ¶¶ 6, 7.)

4

scheduled for 9:00 a.m. with a psychiatrist identified by the parties only as Dr. Miller. The parties do not agree, however, on what information Galantha relied on in making the decision to schedule the appointment.

Under Jackson's version of the events, the only incidents Galantha took into account in making the decision to schedule a psychological evaluation were the "trench incident" described above and a car accident that occurred in 1998. In July 1998, Jackson was driving a large "Vactor" truck[3] when it rear-ended several passenger cars stopped at an intersection. (*Id.*) The accident, which took place during the day, in clear weather and with normal traffic conditions, resulted in several vehicles being wrecked and several injuries. (Def. L.R. 56.1 ¶¶ 23-24.) Lake County's Accident Review Board determined that the accident was preventable and that Jackson contributed significantly to it.[4] (Def. L.R. 56.1 ¶ 29.) Jackson maintains that only the "trench incident" and this accident could have been considered by Galantha when he made the decision to send Jackson for the psychological examination. Jackson claims that other information supplied to Galantha by Jackson's supervisors was not furnished until a March 21, 2001 meeting, which took place nearly twenty days after Galantha decided to make Jackson submit to the examination. (Pl. L.R. 56.1 ¶¶ 59-64.)

Under Lake County's version of the events, after the February 21 meeting ended but before Galantha scheduled the examination for Jackson, Galantha spoke with all three of Jackson's supervisors, Grinnell, Tim Fleece ("Fleece") and John Streicher ("Streicher"). The

---

[3]A Vactor truck is apparently a sewer cleaning truck that weighs 25-tons.

[4]After this accident, Grinnell was asked by Lake County's safety committee to "test drive" Jackson. (Pl. L.R. 56.1 ¶ 14.) Grinnell tested Jackson's driving abilities and stated that Jackson had checked out fine on the trucks he had to drive. (Pl. L.R. 56.1 ¶¶ 15-16.) Thereafter, Jackson was returned to driving without restrictions. (Pl. L.R. 56.1 ¶ 15.)

parties dispute what Fleece told Galantha. Lake County relies on Galantha's testimony that Fleece compared Jackson with his co-workers and stated that Jackson always seemed to take the longest amount of time to do the snowplowing routes, completed the fewest number of loads when hauling sludge, and that co-workers had difficulty working with Jackson because he would forget instruction within a half hour of being told what to do. Jackson relies on Fleece's testimony that at the meeting with Galantha he "really didn't say anything" and did not tell Galantha that Jackson would get lost while driving or forget instructions and directions. (Pl. Resp. to Def. L.R. 56.1 ¶¶ 214-220.)

Grinnell reported to Galantha that Jackson exhibited unusual behavior on the job, frequently confused people, work sites and events, and was always the last driver to return from his snow plowing route, even though he always drove the same route, because he consistently had trouble finding the locations he was supposed to plow. (Def. L.R. 56.1 ¶ 19.) Moreover, Grinnell also reported that Jackson took twice as long as the other drivers to drive the sludge truck from the Diamond Lake plant to the Vernon Hills plant, put twice as many miles on the truck, forgot his daily work assignments two to three times a week, regularly got lost or forgot directions on routes that should have been known, seemed very nervous and excitable and would get upset when he thought a co-worker had made comments about him.[5] (Id.) Grinnell did not have any other employees with these types of problems. (Def. L.R. 56.1 ¶ 21.)

Galantha, who is the final decision-maker on employment decisions at Lake County's Department of Public Works, became concerned with the things Jackson's supervisors related to

---

[5]Grinnell made a record of these concerns in a memorandum he prepared on March 23, 2001. (Def. L.R. 56.1 ¶ 20.)

him. (Def. L.R. 56.1 ¶ 23.) Moreover, Galantha became particularly concerned because Jackson had previously been involved in the 1998 major accident. (*Id.*) Lake County claims that Galantha took the 1998 accident into consideration, along with the "trench incident" and the concerns by Jackson's supervisors, in concluding that there were serious doubts as to whether Jackson could safely operate heavy equipment and trucks. (Def. L.R. 56.1 ¶ 33.)

On March 28, 2001, at approximately 1:30 p.m., Galantha met with Jackson to inform him that a psychological evaluation was set for the next day, March 29, at 9:30 a.m.[6] (Pl. L.R. 56.1 ¶ 98; Pl. Resp. to Def. L.R. 56.1 ¶ 37.) Galantha instructed Jackson to attend the March 29 psychological evaluation with Dr. Miller. (Def. L.R. 56.1 ¶ 37.) Other than the fact that this was a psychological examination, neither Galantha nor Jackson were aware of what type of testing would be involved. (Pl. L.R. 56.1 ¶¶ 94-95.) Jackson responded to Galantha by stating that he wanted to meet with his attorney prior to going to the examination and that he felt as if his "rights were being violated." (Def. L.R. 56.1 ¶ 38; Pl. L.R. 56.1 Add. Facts ¶ 124.) Galantha gave Jackson permission to leave work early that afternoon so that he could consult with his attorney. (*Id.*) Galantha informed Jackson, however, that he needed to know by that evening whether Jackson was going to attend the examination the next day. (Def. L.R. 56.1 ¶ 39.) Jackson did not speak to Galantha that evening. (*Id.*)

After leaving work early on March 28th, Jackson spoke with attorney G. John Marmet ("Marmet"), who specializes in tax matters. (Pl. L.R. 56.1 Add. Facts ¶ 129.) Marmet advised Jackson that he should consult with a labor/employment attorney prior to submitting to the exam

---

[6]Galantha waited until 1:30 p.m on the day before the examination was to take place because he did not want to worry Jackson too far in advance of the appointment. (Pl. L.R. 56.1 ¶ 92.)

and that Jackson should go to the doctor's office and reschedule the exam. (*Id.*) The conversation ended after normal business hours. Jackson claims that he did not call Galantha that evening because the work day was already over and he believed that Galantha would no longer be at work.[7] (Pl. L.R. 56.1 Add. Facts ¶ 130.)

The next morning, March 29, Jackson advised Galantha at 7:15 a.m. that he was going to Dr. Miller's office that morning. (Def. L.R. 56.1 ¶ 40.) The parties do not agree on what exactly Jackson told Galantha. Jackson claims that he informed Galantha that his attorney had referred him to another attorney and also advised him to reschedule the appointment for a later time so that Jackson could obtain legal advice. (Pl. L.R. 56.1 Add. Facts ¶ 131.) Jackson further claims that Galantha's response was "Okay just make sure you keep your appointment." (*Id.*) Lake County denies Jackson informed Galantha that his attorney recommended he reschedule the appointment. Instead, Lake County states that Jackson did not inform Galantha that he intended to reschedule his appointment with Dr. Miller. (Def. L.R. 56.1 ¶ 45; Def. Resp. to Pl. L.R. 56.1 Add. Facts ¶ 131.) Both Galantha and Grinnell believed, based on their separate conversations with Jackson that morning, that Jackson had agreed to go to the psychological examination. (Def. L.R. 56.1 ¶ 42.)

Grinnell allowed Jackson to leave work at 8:30 a.m. on March 29 to go to Dr. Miller's office, which is a 15-25 minute drive from the Lake County Public Works Department. (Def. L.R. 56.1 ¶ 41.) Jackson left work at around 8:30 or 8:45 and arrived at Dr. Miller's office at around 9:00 a.m. (Def. L.R. 56.1 ¶ 44.) Although released from work at 8:30 a.m., Jackson was

---

[7] Lake County admits that Jackson so testified in his deposition but it, nonetheless, denies this allegation. (Def. Resp. to Pl. L.R. 56.1 Add. Facts ¶ 130.) Lake County does not support its denial with a citation to record.

8

still being paid for the time that he missed work to go to Dr. Miller's office. (Def. L.R. 56.1 ¶ 57.)

When Jackson arrived at Dr. Miller's office, he explained to the receptionist that he did not know what the exam was all about and asked if he could speak with Dr. Miller.[8] (Pl. L.R. 56.1 Add. Facts ¶ 134.) Because Dr. Miller was unable to talk to him at that point, Jackson claims that he sat in the waiting room for about 10 minutes, talked with the receptionist for another 10 to 15 minutes, rescheduled his appointment and left at around 9:30. (Pl. Resp. to Def. L.R. 56.1 ¶ 47.)

Just after 9:00 a.m. on March 29, Brummond received a phone call from Brandt Byrd in the Lake County Human Resources Department. (Def. L.R. 56.1 ¶ 48.) Byrd informed Brummond that Jackson had rescheduled his appointment with Dr. Miller and had left the doctor's office. (Id.) Brummond relayed this information to Galantha and Grinnell. (Id.) Jackson reported directly to Grinnell as soon as he returned to work. (Def. L.R. 56.1 ¶ 50.) Jackson later told Galantha that he returned to work that morning at 9:50 a.m. (Def. L.R. 56.1 ¶ 49.) Grinnell, however, told Galantha that Jackson returned "around 10:00 o'clock or somewhere around 10:00 o'clock or after 10:00 o'clock." (Def. L.R. 56.1 ¶ 51.)

During the afternoon of March 29, Jackson was called into a meeting with Galantha, Brummond and Grinnell. (Def. L.R. 56.1 ¶ 52.) At the meeting Galantha apparently first asked Jackson why he did not keep the appointment, to which Jackson responded "I made the appointment." (Pl. L.R. 56.1 Add. Facts ¶ 137.) Galantha became angry and responded by

---

[8]Lake County disputes that Jackson did not know what the exam was about. (Def. Resp. to Pl. L.R. 56.1 Add. Facts ¶ 134.)

stating his belief that Jackson was lying and was otherwise playing word games. (*Id.*) Galantha also asked Jackson why he had taken so long to return to work from Dr. Miller's office. (Def. L.R. 56.1 ¶ 53.) Jackson responded by telling Galantha that he left Dr. Miller's office at approximately 9:30 a.m. and had returned directly to work. (*Id.*) Jackson did not tell his supervisors that on the way back from Dr. Miller's office he stopped at a McDonald's to the use the washroom and to get a breakfast sandwich. (Def. L.R. 56.1 ¶ 55.) After getting the sandwich, Jackson sat in his vehicle in the McDonald's parking lot for 10 to 15 minutes eating, all of which Jackson believed was part of his morning break. (*Id.*; Pl. L.R. 56.1 Add. Facts ¶ 145.) Galantha was angry at Jackson because he believed that Jackson had lied to him by telling him that was going to the exam and then rescheduling it and had lied about the extended time Jackson had taken to return to work. (Def. L.R. 56.1 ¶ 57.) Galantha was also angry at Jackson for wasting a hour and a half while he was on Lake County's payroll. (*Id.*) Jackson claims that Galantha raised his voice, swore and cussed at him. (Pl. L.R. 56.1 Add. Facts ¶ 136.) Jackson further claims that Galantha was enraged at him to the point where "his veins were popping out of his neck." (*Id.*) Lake County admits that Galantha raised his voice but denies any swearing, cussing or that veins were popping out of Galantha's neck. (Def. Resp. to Pl. L.R. 56.1 Add. Facts ¶ 136.) At the end of the meeting, Jackson was suspended without pay until he appeared for the psychological examination with Dr. Miller. (Def. L.R. 56.1 ¶ 56.)

On April 5, 2001, Lake County's Human Resources Department rescheduled Jackson's second psychological examination for April 20 and sent Jackson notice of the exam on April 16. (Def. L.R. 56.1 ¶ 58.) In that notice, Jackson was told that he was required to attend the second appointment. (*Id.*) This notice did not contain information regarding the scope of the

examination, the nature of the inquiries or tests to be performed. (Pl. L.R. 56.1 ¶ 104.) Jackson refused to go to the April 20 examination. (Def. L.R. 56.1 ¶ 59.) Afterward, Jackson received a letter from Galantha, dated April 27, 2001, in which Galantha reiterated his safety concerns and the reasons why he was requiring Jackson to attend a psychological examination with a psychiatrist. (Def. L.R. 56.1 ¶ 60.) Jackson further received a letter from Galantha, dated May 16, 2001, in which Jackson was informed that a third psychological exam had been scheduled with a Dr. Lammers, also a psychiatrist. (Def. L.R. 56.1 ¶ 62.) The letter told Jackson that Dr. Lammers planned only to perform a basic mental status exam. (Def. L.R. 56.1 ¶ 63.) It further ordered Jackson to attend the exam and stated that if he refused to go, a pre-termination hearing would be held. (Def. L.R. 56.1 ¶ 64.)

Jackson refused to go to the June 7, 2001 exam. (Def. L.R. 56.1 ¶ 67.) On June 18, 2001, Galantha sent Jackson a letter notifying him that a pre-termination hearing was being scheduled for June 25, 2001. (Def. L.R. 56.1 ¶ 68.) This letter stated that at the hearing, Jackson would be given the opportunity to respond to charges that he (1) failed to follow orders to attend a fitness for duty evaluation on three separate occasions; (2) was dishonest on March 29, 2001 with regards to whether he was going to go to the fitness for duty examination; and (3) failed to return to work immediately after leaving the doctor's office and refused to explain his extended absence. (*Id.*) At the June 25 pre-termination hearing Galantha terminated Jackson's employment with Lake County. (Def. L.R. 56.1 ¶ 71.) Both parties agree that Jackson does not suffer from any mental or physical impairment. (Def. L.R. 56.1 ¶ 72.)

# DISCUSSION

## A.    Mental Examination (Count I)

Under 42 U.S.C. § 12112(d)(4)(A), a covered entity[9] "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." The threshold issue the parties dispute is whether, in fact, this section applies to Jackson, who admits that he suffers from no mental or physical impairment.[10] To fully address this issue, the court provides some background as to the other sections of 42 U.S.C. § 12112(d).

The ADA generally prohibits discrimination against "a qualified individual with a disability . . . ." 42 U.S.C. § 12112(a). With respect to medical examinations and inquiries, § 12112(d) provides separate rules depending on whether the individual is a job applicant, an applicant with an offer who has not yet begun working or an employee.

Subsection (d)(1) first states that "in general" "the prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries." Subsection (d)(2) then provides that, with respect to job applicants who have not received an offer, an employer may only make preemployment inquiries of an applicant's ability "to perform job-related functions" but not into whether the applicant is disabled. *See* § 12112(d)(2)(A) and (B). Under subsection (d)(3), which applies to an applicant who has received an offer of

---

[9]Lake County admits that it is a covered entity. (Def. Resp. to Pl. L.R. 56.1 ¶ 5.)

[10]As is discussed in part B of this opinion below, an issue of fact exists as to whether Lake County regarded Jackson as disabled. The court still addresses the issue of mental examinations of non-disabled employees, however, so that this Count I claim is not dependent on the resolution of any of the factual disputes addressed below with respect to Jackson's other claims.

employment but who has not yet started work, the employer may require a medical examination and make an offer of employment conditional on the results of such examination so long as (1) all employees are subject to such inquiry; (2) information obtained is maintained on separate forms and in separate files and treated as confidential; and (3) the results of the examination are "only used in accordance with this subchapter." § 12112(d)(3); 29 C.F.R. § 1630.14(b). As for the third requirement that the results are "only used in accordance with this subchapter," phrased another way, this means "as long as the employer does not discriminate on the basis of the applicant's disability." *O'Neal* v. *City of New Albany*, 293 F.3d 998, 1010 n.2 (7th Cir. 2001). Finally, under subsection (d)(4), which applies to employees and is applicable here, the employer may not inquire into whether an employee suffers from a disability unless any such examination is "job-related and consistent with business necessity." § 12112(d)(4)(A); 29 C.F.R. § 1630.14(c). These rules under 12112(d) apply to psychiatric and mental evaluations as well as medical examinations. *Conrad* v. *Board of Johnson County Comm'rs*, 237 F. Supp. 2d 1204, 1230 (D. Ks. 2002); *Fritsch* v. *City of Chula Vista*, No. 98-0972-E-CGA, 2000 WL 1740914, at *3-6 (S.D. Cal. Feb. 22, 2000).

Jackson argues that because subsection (d)(4) applies to all "employees," not just qualified individuals with disabilities, it should be applicable here even if he is not disabled. He relies on *Fredenburg* v. *Contra Costa County Dep't of Health Servs.*, 172 F.3d 1176, 1181-82 (9th Cir. 1999) and *Roe* v. *Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1229 (10th Cir. 1997) for support. *See also*, *Cossette* v. *Minnesota Power & Light*, 188 F.3d 964, 969-70 (8th Cir. 1999); *Griffin* v. *Steeltek, Inc.*, 160 F.3d 591, 594 (10th Cir. 1998); *Karraker* v. *Rent-a Center*, 239 F. Supp. 2d 828, 834-35 (C.D. Ill. 2003). Lake County argues that only

13

disabled individuals can sue for violations under § 12112, and cites to a series of district court cases that so hold. *Adler* v. *I & M Rail Link, L.L.C.*, 12 F. Supp. 2d 912, 935-37 (N.D. Ia. 1998); *Armstrong* v. *Turner Indus. Ltd.*, 950 F. Supp. 162, 166-68 (M.D. La. 1996) *aff'd on other grounds*, 131 F.3d 554 (5th Cir. 1998); *Varnagis* v. *City of Chicago*, No. 96 C 6304, 1997 WL 361150, at *6-7 (N.D. Ill. June 20, 1997). *See also Krocka* v. *Bransfield*, 969 F. Supp. 1073, 1094-95 (N.D. Ill. 1997). The Seventh Circuit has yet to decide this issue. *See O'Neal*, 293 F.3d at 1007 ("We have not yet addressed the question of whether a non-disabled plaintiff can sue for violations of [the § 12112(d)] provisions.");[11] *but see, Murdock* v. *Washington*, 193 F.3d 510, 512 (7th Cir. 1999) (in dicta, noting that "[a]lthough Title I of the ADA, prohibiting disability discrimination in employment, has a section limiting medical testing for disabilities, *see* 42 U.S.C. § 12112(d)(2)-(4), and does not require that an individual be disabled to state a claim, it does not apply to Murdock's case because Murdock is an inmate in prison, not an employee or job applicant.").

Starting first with the cases that allow a non-disabled employee to sue under certain subsections of § 12112(d), the court in *Cossette* concluded that subsection (d)(4), and certain non-disclosure portions of (d)(3), would apply to an employee/job applicant regardless of any showing of disability. 188 F.3d at 969. The court noted that both subsections referred to "employees" and "applicants," which is "in stark contrast" to the ADA's general prohibition of discrimination against a qualified individual with a disability. *Id.* at 969. Moreover, the court

---

[11] The court did state in a footnote, after citing the Tenth Circuit's opinion in *Griffin* v. *Steeltek, Inc.*, 160 F.3d 591, 593-95 (10th Cir. 1998) (concluding that non-disabled applicant may sue under subsection (d)(2)), that subsection (d)(3) was "unambiguous" and that "an employer may reject an applicant based on the results of a post-offer medical examination as long as the employer does not discriminate on the basis of the applicant's disability. If the applicant is not disabled, or makes no showing that the employer regarded her as disabled, then the applicant cannot recover under § 12112(d)(3)(C)."

14

concluded that a contrary reading of subsection (d)(4) would "obliterate much of [its] usefulness." *Cossette*, 188 F.3d at 969. Quoting from *Roe*, the court noted that "[i]t makes little sense to require an employee to demonstrate that he has a disability to prevent his employer from inquiring whether or not he has a disability." *Id.*, quoting *Roe*, 124 F.3d at 1230. The court in *Fredenburg* analyzed subsections (d)(2), (3) and (4) in a similar fashion, 172 F.3d at 1182, as did the court in *Roe* when dealing only with subsection (d)(4). 124 F.3d at 1229.

The cases cited by Lake County hold that an employee must be disabled to invoke any of the protections under § 12112(d). The Eighth Circuit expressly rejected *Adler*, cited by Lake County, in *Cossette*. 188 F.3d at 970 n.4 ("We are not persuaded by the reasoning in *Adler*."). The other cases on which Lake County relies reasoned that because § 12112(d)(1) states that "[t]he prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries" and subsection (a) of § 12112 prohibits discrimination against only "a qualified individual with a disability," subsections (d)(2), (3) and (4) should also refer back to the general prohibition of discrimination against only qualified individuals with disabilities. *See Varnagis*, 1997 WL 361150, at *7; *Armstrong*, 950 F. Supp. at 167. Lake County relies on this reading of the statute, arguing that subsections (d)(2), (3) and (4) are specific aspects of the general rule listed in subsection (d)(1), which in turn refers back to subsection (a) prohibiting discrimination only against a qualified individual with a disability. In addition, the cases Lake County relies on also conclude that the legislative history of the ADA supports the view that the restrictions in § 12112(d) were meant only to apply to qualified individuals with disabilities. *Id.*, *Armstrong*, 950 F. Supp. at 167.

The more persuasive view is that a non-disabled employee may bring suit under subsection (d)(4). To hold otherwise, as the Tenth Circuit aptly noted above, would afford Jackson, or any other employee, protections from prohibited examinations only if they prove that they are disabled. *See Roe*, 124 F.3d at 1229. Such a result would create the following quandary the Ninth Circuit explained in relation to subsection (d)(2),

> [A]n employer could not require job applicants to take an HIV test unless the inquiry were shown to be job-related. This restriction prevents employers from using HIV tests to deter HIV-positive applicants from applying; requiring applicants challenging the test first to prove that they are in fact disabled-thereby revealing their HIV status-would render the section nugatory.

*Fredenburg*, 172 F.3d at 1182. Or by analogy here, requiring Jackson to prove that he is in fact disabled in order to invoke the protection of (d)(4) would undermine the policy that an employer may not ascertain whether an employee is disabled unless the disability relates to his or her job. As noted in the cases Jackson cites, the language in subsection (d)(4) speaks of an "employee," specifically prohibiting "inquiries of an employee as to whether the employee is an individual with a disability . . . ." Moreover, the subsection does not contain the much narrower language applying only to a "qualified individual with a disability" contained in subsection (a). Nor does the court find persuasive Lake County's view that subsection (d)(4) must relate back to the general rule contained in (d)(1). First, the language is clearly broader in subsection (d)(4) and in no way references subsection (d)(1). Also, subsection (d)(1) provides only that the prohibition against discrimination contained in subsection (a) applies to medical examinations and inquiries. Subsection (d)(4), however, deals not necessarily with discrimination but rather the prohibition in general of forcing an employee to take such a test. *See, e.g., Cossette*, 188 F.3d at 969 (noting that (d)(1) "is only one of several protections afforded by subsection (d), and it is only

16

discrimination (and not illegal disclosure [in the context of (d)(3)]) that requires a showing of disability."). Accordingly, the court concludes that Jackson may maintain a claim under § 12112(d)(4) even though he is not disabled.

Lake County next argues that Jackson cannot bring suit because no mental examination ever took place due to Jackson's refusal to attend the examination. Lake County advances dicta in *Sullivan* v. *River Valley Sch. Dist.*, 197 F.3d 804, 812 (6th Cir. 1999), to support its view. In that case, after the court had already concluded that the examinations ordered by the defendant were consistent with business necessity, and apparently in addressing whether the examinations could be challenged as being too broad to be job-related, the court noted that "[s]ince Sullivan never submitted to the examinations, he precluded himself from being able to establish a genuine issue of material fact as to whether the exams were related to his job, or were too broad in scope." *Id.; see also, Larsen* v. *Miller-Dwan Med. Ctr.*, No. 00-2017, 2001 WL 1325963, at *5-6 (D. Minn. 2001). At best, this language only supports the view that Jackson could not challenge whether the exam itself was too broad to be for job-related concerns, but it does not preclude Jackson from proving that there was insufficient business necessity for any mental health examination, what the *Sullivan* court referred to as "significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Id.* at 811.

Because the court concludes that Jackson may maintain an action under § 12112(d)(4), the next relevant inquiry becomes whether the examinations ordered by Lake County in this case were "job-related and consistent with business necessity." *See* § 12112(d)(4). Lake County urges the court to adopt a subjective standard for evaluating whether inquiries or examinations

are job-related and consistent with business necessity. According to Lake County, the statutory language does not require "reasonable evidence" to support an employer's decision to require a medical examination. From this, Lake County argues that an objective standard "is not supported by the statutory language . . . ." (Def. Mot. for Summ. J. 10-11.) Lake County also claims that an objective standard is inappropriate because it "starts with the presumption that the employee has a medical condition and the employer is aware of that condition," and that this restricts the employer because it "will not know whether that behavior is being caused by a medical condition until the employee is actually examined." Thus, Lake County argues that the court should apply a "honest belief" rule used in other areas of employment law so as to prevent the employer from assuming the role of a doctor in deciding whether there is a legitimate business need for an examination.

Despite Lake County's assertions to the contrary, the court believes an objective or reasonable person standard is more appropriate. Most courts have applied such a standard in cases involving employee medical examinations under the ADA. *See, e.g., Tice* v. *Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001) ("The ADA's requirement that [a medical examination] be consistent with business necessity is an objective one."); *Sullivan*, 197 F.3d at 813 ("An employee's protection from harmful intent on an employer's part comes from the dual requirements that there be evidence sufficient for a reasonable person to doubt whether an employee is capable of performing the job, and that any examination be limited to determining an employee's ability to perform essential job functions."); *Terry* v. *City of Greensboro*, No. 1:02 CV 00221, 2003 WL 151851, at *4 (M.D.N.C. Jan. 17, 2003) ("Mental and physical examinations have been upheld as preconditions to returning to work if the request is supported

by a reasonable belief about the plaintiff's capabilities and the examination relates to essential functions of the job."); *Conrad*, 237 F. Supp. 2d at 1230 ("An employer's request that an employee undergo a medical examination must be supported by evidence that would cause a reasonable person to inquire as to whether an employee is still capable of performing his/her job.") (internal quotations omitted); *Law* v. *Garden State Tanning*, 159 F. Supp. 2d 787, 794 (E.D. Pa. 2001) ("There must be sufficient evidence for a reasonable person to doubt whether an employee is capable of performing the job, and the examination must be limited to determining an employee's ability to perform essential job functions.").[12]

Lake County fears that a reasonable person or objective based standard otherwise restricts the employer or requires it to assume the role of a doctor in deciding whether there is a legitimate need for a medical examination. As the courts above noted, all that is required is that there "be evidence sufficient for a reasonable person to doubt whether an employee is capable of performing the job, and that any examination be limited to determining an employee's ability to perform essential job functions." *Sullivan*, 197 F.3d at 813. A reasonable person in this context is a reasonable employer, not a reasonable physician. Accordingly, the court applies this standard here. For Lake County's decision to be permissible under the ADA, there must be sufficient evidence for a reasonable person to doubt whether Jackson was capable of performing his job, and any examination must have been limited to determining Jackson's ability to perform essential job functions.

---

[12]This reasonable person approach is also consistent with the EEOC's view of the evidence necessary for an employer to order a medical examination. In its Policy Guidance on Genetic Testing, the EEOC stated that "[g]enerally, an employer only may seek information about an employee's medical condition when it is job related and consistent with business necessity. This means that the employer must have a reasonable belief based on objective evidence that . . . ."

19

Jackson claims that, viewing the evidence in a light most favorable to him, Galantha decided on March 1 that Jackson should submit to a psychological examination based only on Lake County's view of the "trench incident" and the 1998 car accident. Jackson maintains that this is not sufficient evidence from which a reasonable person could doubt that he is capable of performing his job. Moreover, Jackson claims that because he was never informed as to what the exams would consist of, the examinations were overbroad and not limited to determining whether he had the ability to perform the essential functions of his job.

The issues are (a) whether the trench incident and the car accident would lead a reasonable employer to believe Jackson might be unable to perform his job; if not, (b) whether the added information derived from the supervisors (he was confused on the job, got lost on routes, logged twice the mileage on sludge trucks and forgot basic instructions) was sufficient; if so, (c) whether the dispute of fact as to when the that information came to Galantha makes a difference; and (d) whether the examination was broader than permitted by law.

Unless the court can say no reasonable jury could resolve these issues in favor of Jackson, summary judgment must be denied. Certainly, a reasonable jury could find that the accident and the trench incident (of which the parties give divergent accounts) were insufficient to create a reasonable doubt as to whether Jackson could perform his job. And just as the question whether the two incidents make a reasonable doubt, it follows that the additional information from the supervisors also presents a jury question, that is, a reasonable jury, in light of this information as well, could find that a reasonable employer would not doubt Jackson's ability to perform the job, particularly if the jury were to disbelieve Galantha as to when he came into the information and to draw an inference that the additional information is merely *post hoc* justification.

On the other hand, as implied above, Jackson's desire to challenge the breadth of an examination he never took is foreclosed. He has not presented evidence as to what the exam would have entailed. Lake County's evidence is that it was a "basic mental status exam." There being no dispute of fact as to the content of the examination, it must be concluded that if an exam is justified under the above analysis, a basic mental status exam was not overbroad. In other words, no reasonable jury could find to the contrary.

Finally, with respect to Jackson's motion for summary judgment, the same questions of fact expressed above foreclose summary judgment on his Count I claim. A reasonable jury could find that the accident and the trench incident (of which the parties give divergent accounts) were sufficient to create a reasonable doubt as to whether Jackson could perform his job, and a reasonable jury, in light of the supervisors' information, could find that a reasonable employer would doubt Jackson's ability to perform the job, particularly if the jury were to believe Galantha that he talked to the supervisors before he made the appointment.

For these reasons, Jackson's motion for summary judgment on this claim is also denied.

## B.     Perception of Disability (Count II)

As mentioned above, the ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. ¶ 12112(a); *Basith* v. *Cook County*, 241 F.3d 919, 927 (7th Cir. 2001). An employee may prevail under the ADA by presenting either direct or indirect evidence of discrimination. *E.g.*, *Pugh* v. *City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001).

Jackson here relies on indirect evidence, so the court applies the *McDonnell Douglas* burden shifting method. *Id.*

Under the *McDonnell Douglas* burden shifting method Jackson must first establish his *prima facie* proof. To establish a *prima facie* case of discrimination under the ADA, Jackson must show that (1) he is disabled within the meaning of the ADA, (2) he is qualified to perform the essential functions of his job either with or without reasonable accommodation, and (3) he suffered an adverse employment decision because of the disability. *Id.* If Jackson establishes his *prima facie* case, the burden shifts to Lake County to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* at 627. If Lake County meets its burden, Jackson must prove, by a preponderance of the evidence, that Lake County's reasons are a pretext for discrimination. *Id.*

Starting with the issue of disability, which is the threshold of Jackson's *prima facie* case, a disability under the ADA is defined as either:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
(B) a record of such impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2); *Sutton* v. *United Air Lines*, 527 U.S. 471, 478 (1999). A major life activity is an activity of central importance to daily life. *Toyota Motor Mfg. Kentucky, Inc.* v. *Williams*, 534 U.S. 184, 197 (2002). ADA regulations provide the following representative list of major life activities: caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning and working. 29 C.F.R. § 1630.2(i). A substantial limitation is defined under the ADA regulations as

Unable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(i).

Jackson argues that Lake County regarded him as having an impairment that substantially limited major life activities. To be "regarded as having such an impairment" under the ADA, Jackson must show that:

(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or
(2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.

*Sutton*, 527 U.S. at 489; *Mack* v. *Great Dane Trailers*, 308 F.3d 776, 780 (7th Cir. 2002). Even under this "regarded as having such an impairment" section of the ADA, Jackson still must show that Lake County believed the impairment "substantially limited" a "major life activity." *Sutton*, 527 U.S. at 489; *Mack*, 308 F.3d at 780. "The purpose of the 'regarded as' definition of a 'disability' is to cover individuals rejected from a job because of the 'myths, fears and stereotypes' associated with disabilities." *Amadio* v. *Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001), quoting *Sutton*, 527 U.S. at 489-90.

In arguing that it did not perceive Jackson as suffering from an impairment, Lake County claims that reports from Jackson's supervisors that he was confused, forgetful and got lost while driving, along with the 1998 accident, were at most concerns about Jackson, and having doubts about an employee is not the equivalent of perceiving the employee as having an impairment. *See, e.g., Tice*, 247 F.3d at 515 ("Doubts alone do not demonstrate that the employee was held in

23

any particular regard."). Moreover, Lake County claims that even if it did perceive Jackson as suffering from an impairment, that conclusion would not amount to its perceiving Jackson as substantially limited in a major life activity. For example, Lake County argues that any concern it had over Jackson's driving or operating heavy equipment would not establish that it perceived Jackson as substantially limited in the life activity of working, which would require a substantial limitation in working in a broad range of jobs. *See, e.g., Weiler* v. *Household Fin. Corp.*, 101 F.3d 519, 525 (7th Cir. 1996) ("Rather, with respect to the major life activity of working, 'substantially limits' must mean significantly restricts the ability to perform a class of jobs or a broad range of jobs in various classes."). Also, Lake County argues that any concerns it may have had about Jackson getting lost or seeming confused cannot be considered substantial impairments on any other major life activities. In response, Jackson asserts that Lake County perceived him as suffering from a mental impairment which substantially limited what Jackson characterizes as the major life activities of remembering, listening, comprehending basic instructions, learning, performing simple tasks, working and communicating.

Genuine issues of fact exist as to whether Lake County perceived Jackson as suffering from an impairment that affected the major life activity of learning. Viewing the facts in a light most favorable to Jackson, a reasonable jury could so find based on numerous facts in evidence. For example, after Jackson told Galantha about the behavior that Jackson believed was harassing, Galantha told Jackson that he was "hypersensitive" and that he was the one with the problem. (Pl. L.R. 56.1 Add. Facts ¶ 177.) Galantha also indicated to Jackson that there was something wrong with his head, and that there was medication for people like Jackson. (Pl. L.R. 56.1 Add. Facts ¶ 179.) Galantha also allegedly told Jackson that his desire to seek legal counsel in

24

connection with the psychological examination was another example of his erratic behavior. (Pl.
L.R. 56.1 Add. Facts ¶ 180.)[13]

Other than as they relate to learning[14], the court rejects Jackson's position that Lake
County's other perceptions of him related to an impairment of a major life activity. Jackson
claims that he was substantially limited in the major life activity of working. As noted above, a
substantial limitation on working means "significantly restricted in the ability to perform either a
class of jobs or a broad range of jobs in various classes as compared to the average person having
comparable training, skills and abilities." *EEOC* v. *Rockwell Int'l Corp.*, 243 F.3d 1012, 1017
(7th Cir. 2001), quoting 29 C.F.R. § 1630.2(j)(3)(i). Jackson's argument that Lake County
perceived him as forgetting work instructions and "confusing people, work sites and events on a
regular basis" "is not one of the rare cases in which the claimants' impairments are so severe that
their substantial foreclosure from the job market is obvious." *Id.* Thus, at minimum, Jackson
"had to come up with some evidence of the number and types of other jobs . . . from which . .

---

[13] In addition, Grinnell considered Jackson an outcast and thought he was paranoid because he was "always
hesitant in whatever he did, always second guessed himself, very nervous around everything he's trying to do, [and
he] had a hard time grasping what everybody else was a trying to do." (Pl. L.R. 56.1 Add. Facts ¶¶ 147-48.)
Grinnell also admitted that he refrained from disciplining Jackson "because it was Don" and that often he gave him a
break because of Jackson's "ways and his antics." (Pl. L.R. 56.1 Add. Facts ¶ 155.) Grinnell also stated that "[w]e
just learned to work with Don, around Don, do things with Don . . . [a]round Don, have him do things that Don can
do." (Pl. L.R. 56.1 Add. Facts ¶ 164.) Grinnell testified that he could not give Jackson a list of things to do because
he would forget them, and that he had to give Jackson instructions one at a time. (Pl. L.R. 56.1 Add. Facts ¶ 150.)
Also, Grinnell testified that Jackson would forget his daily work assignment within minutes of the morning staff
meeting two to three times per week. (Pl. L.R. 56.1 Add. Facts ¶ 149.) Lake County's response to this evidence is
to suggest that it never perceived Jackson as being substantially limited in learning. The court, however, believes
that a reasonable jury could find otherwise.

[14] Jackson maintains that "remembering" and "comprehending basic instructions" are major life activities
that Lake County perceived as substantially limited in him. He cites no authority for that position. The court treats
these skills as simply part of the major life activities of learning and working. *See Emerson* v. *Northern States
Power Co.*, 256, F.3d 506, 511 (7th Cir. 2001) (without deciding whether memory, concentration and interacting
with others were major life activities, noting that "we will adopt the district court's approach and treat memory,
concentration, and interacting with others as activities that feed into the major life activities of learning and
working.").

25

.[he] would be excluded because of [Lake County's] perceived impairments." *Id.* Jackson did not do this, nor did he present any evidence at all on his claim that he was substantially limited in the major life activity of working.

Jackson cites no authority that "listening" is a major life activity. And although hearing is expressly listed in the representative list of major life activities contained in the ADA regulations *see* 29 C.F.R. § 1630.2(i), there is no evidence that Lake County perceived Jackson as substantially limited in his ability to hear. Further, Jackson's claim that "performing simple tasks" is a major life activity for which Lake County perceived him as being substantially limited also fails. The Supreme Court has stated that to be substantially limited in performing manual tasks "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota Motors Mfg.*, 534 U.S. at 198. The Court listed the following as examples of "manual tasks" with central importance to people's lives: household chores, bathing and brushing one's teeth. *Id.* There is no evidence that Lake County perceived Jackson as disabled in anything resembling these examples. Nor does Jackson point to any task which is of central importance to people's lives that Lake County perceived as significantly restricted.

Moving to Jackson's claim that he was perceived as substantially limited in the major life activity of "communicating," Jackson again cites no authority to support this view. While the ADA regulations identify "speaking" as a major life activity, there is no evidence here that Lake County perceived Jackson as having limited ability to speak.

Since the court concluded above, however, that there are genuine issues of fact as to whether Jackson was perceived as disabled in the major life activity of learning, Jackson passes

26

the threshold portion of his *prima facie* case. In addition, since neither of the parties present argument on the other two prongs of Jackson's *prima facie* case, the court shall assume for purposes of this motion that those are also established. *See Pugh*, 259 F.3d at 626-27 ("Like the district court, we shall assume that Mr. Pugh has established the remaining two prongs of the *prima facie* case.").

The burden then shifts to Lake County to articulate a legitimate, nondiscriminatory reason for suspending and terminating Jackson. *Id.* at 626. Lake County maintains that Jackson was suspended without pay for (1) lying to Galantha; (2) insubordination; and (3) failing to adequately account for his whereabouts after he rescheduled the psychological examination. Lake County also argues that Jackson's termination was for refusing to attend on three separate occasions the fitness for duty examination scheduled for him.[15] According to Lake County, all of these reasons for both the suspension and the termination were legitimate and nondiscriminatory.

With respect to Lake County's claim that both the suspension and termination were as a result of Jackson's insubordination, the court notes that an issue of fact exists concerning whether this insubordination for not submitting to the proposed examinations is in fact a legitimate and nondiscriminatory reason. As stated in Count I, a reasonable jury could find that the mental evaluations Lake County required of Jackson were not consistent with business

---

[15]Lake County's argument that Jackson cannot challenge his termination because he failed to amend his EEOC charge of discrimination to include his termination is without merit. The court may hear claims not brought in Jackson's EEOC charge that were included in his complaint so long as "(1) the claim is like or reasonably related to the EEOC charges, and (2) the claim in the complaint could reasonably develop from the EEOC investigation into the original charges." *Harper* v. *Godfrey Co.*, 45 F.3d 143, 148 (7th Cir. 1995); *see also Witherspoon* v. *Roadway Express, Inc.*, 782 F. Supp. 567 (D. Kan. 1992) (discriminatory termination claim which arose during pendency of administrative investigation of discriminatory promotion claim was not barred by failure to exhaust administrative remedies). Jackson's claims regarding his termination meet this standard. The EEOC charge concerned the unlawful examination and suspension based on perceived disability. Jackson's termination reasonable developed out of this suspension and was based on more or less the same conduct concerning Jackson's refusal to attend the psychological evaluation.

necessity. If the trier of fact so decides, Lake County cannot advance as a legitimate and

nondiscriminatory reason for Jackson's termination his refusal to submit to an examination

forbidden under the ADA. Although at least one case has upheld a finding of insubordination for

refusing to submit to a medical examination, *see Sullivan*, 197 F.3d at 812, citing *Moore* v.

*Board of Educ. of the Johnson City Schs.*, 134 F.3d 781, 783 (6th Cir. 1998), there the medical

test at issue had already been declared consistent with business necessity as a matter of law.

*Sullivan*, 197 F.3d at 812. That is not the case here. Thus, whether the insubordination is a

legitimate and nondiscriminatory reason is not properly resolved on this motion.

Lake County offers no other legitimate and nondiscriminatory reason for Jackson's

termination, therefore, that claim survives summary judgment. With respect to Jackson's

suspension, however, Lake County claims that, in addition to insubordination, Jackson was also

suspended because he lied to Galantha and did not account for his whereabouts. These are

legitimate and nondiscriminatory reasons; thus, the issue of pretext must be addressed. Jackson

has the burden to show by a preponderance of the evidence that "the reason[s] proffered by [Lake

County are] a pretext for intentional discrimination." *Id.* (internal citations omitted). To survive

a motion for summary judgment, Jackson must produce evidence that "create[s] an issue of fact

as to whether the reasons offered by [Lake County] were sincere–in [ADA] lingo, not

pretextual." *Id.*, quoting *Green* v. *National Steel Corp., Midwest Div.*, 197 F.3d 894, 898-99 (7th

Cir. 1999) ("ADA" alteration in original) (citation omitted); *see also, Perdomo* v. *Browner*,

67 F.3d 140, 145 (7th Cir. 1995) ("Because a fact-finder may infer intentional discrimination

from an employer's untruthfulness, evidence that calls truthfulness into question precludes a

summary judgment.").

28

Once again, disputed issues of material fact preclude summary judgment. Galantha insists that he suspended Jackson without pay because, among other reasons, Jackson lied to him and did not account for his time. To the contrary, Jackson maintains that he was truthful with Galantha, that Galantha approved of what he was doing and that he did not violate rules with respect to his time. The reasons are interrelated and best resolved by a jury after hearing all the evidence. *See cf. Zaccagnini* v. *Chas. Levy Circulating Co.*, 338 F.3d 672, 679 (7th Cir. 2003), quoting *Russell* v. *Acme-Evans Co.*, 51 F.3d 64, 70 (7th Cir. 1995) (A plaintiff need not rebut all the alleged legitimate and nondiscriminatory grounds in cases in which "the multiple grounds offered by the defendant for the adverse action . . . are so intertwined, or the pretextual character of one of them so fish and suspicious, that the plaintiff [can] withstand summary judgment."). Lake County's argument that Jackson's testimony is unbelievable and self-serving may ultimately be vindicated, but it is the jury's responsibility to resolve the matter.

## C.     Retaliation (Count III)

Under 42 U.S.C. § 12203(a) and (b), it is unlawful to discriminate against an individual because such individual has opposed any act or practice the ADA prohibits or to "coerce, intimidate, threaten, or interfere" with any individual in the exercise or enjoyment of any right under the ADA. Jackson alleges that his suspension and subsequent termination were both attempts to retaliate against him for seeking advice from an employment attorney concerning the psychological examination that was scheduled.

Initially, similar to its argument in Count I, Lake County maintains that because Jackson is not disabled (even though the court believes an issue of fact exists concerning whether he was perceived as such), he cannot assert retaliation claims under the ADA. This argument is rejected.

29

Subsection (a) and (b) of § 12203 both refer to an "individual" and not to a "qualified individual with a disability." *See, e.g., Soileau* v. *Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997) (noting that plaintiff may assert a retaliation claim "even if the underlying claim of disability fails."); *Krouse* v. *American Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997) ("Unlike a plaintiff in an ADA *discrimination* case, a plaintiff in an ADA *retaliation* case need not establish that he is a 'qualified individual with a disability.' By its own terms, the ADA *retaliation* provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA.") (emphasis in original).

Similar to a discrimination claim, a retaliation claim may be established through either direct or indirect evidence. Jackson attempts to prove his claim through indirect evidence. To satisfy his *prima facie* case of retaliation, Jackson must demonstrate that (1) he engaged in a statutorily protected activity; (2) he performed his job according to Lake County's legitimate expectations; (3) despite meeting Lake County's legitimate expectations, he suffered a materially adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Hilt-Dyson* v. *City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002); *Stone* v. *City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). If Jackson succeeds in proving his *prima facie* case, Lake County must offer a legitimate, noninvidious reason for the adverse employment action. *Hilt-Dyson*, 282 F.3d at 465. Assuming that Lake County presents such a noninvidious reason, the burden of production then shifts back to Jackson to demonstrate that the proffered reason is pretextual. *Id.*

On this motion Lake County does not challenge Jackson's *prima facie* case but instead argues that it had legitimate and lawful reasons for terminating and suspending Jackson. As

30

discussed above, Lake County claims that Jackson was suspended for (1) lying to Galantha; (2) insubordination; and (3) failing to adequately account for his whereabouts after he rescheduled the psychological examination. Lake County maintains that Jackson was terminated for his failure to attend the psychological examinations on three separate occasions. Neither of the parties present grounds for summary judgment on the Count III claim with respect to Jackson's termination and suspension that are different from those in Count II. The court, therefore, simply adopts the Count II analysis here. Lake County may not on this motion rely on Jackson's alleged insubordination as a legitimate and nondiscriminatory reason for Jackson's termination or suspension. Moreover, with respect to his suspension, genuine issues of fact exist as to whether Lake County's grounds were pretextual. Thus, summary judgment must be denied on the Count III retaliation claim.

### CONCLUSION

For the reasons stated above, both Jackson's motion for partial summary judgment [#28] and Lake County's motion for summary judgment [#31] are denied. This case is set for trial on November 3, 2003. Final pretrial materials shall be submitted to chambers not later than October 3, 2002. In the meantime, the parties will be referred to the designated magistrate judge for a settlement conference.

Enter: _____

JOAN HUMPHREY LEFKOW
United States District Judge

Date: September 15, 2003

31